**Affirmed and Memorandum Opinion filed May 30, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00457-CV

---

**CONCERT HEALTH PLAN, INC. a/k/a CONCERT HEALTH PLAN a/k/a CONCERT HEALTH PLAN INSURANCE COMPANY, Appellant**

**V.**

**HOUSTON NORTHWEST PARTNERS, LTD**
**d/b/a HOUSTON NORTHWEST MEDICAL CENTER;**
**MULTIPLAN CORPORATION a/k/a MULTIPLAN, INC.;**
**and PRIVATE HEALTHCARE SYSTEMS, INC. a/k/a PHCS, Appellees**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-21478**

---

## M E M O R A N D U M   O P I N I O N

In this dispute between a hospital, an insurance company, and a preferred provider organization, the insurance company appeals from judgments in favor of the hospital and the preferred provider organization. In five issues, the insurance company asserts that the trial court erroneously found that it owed the hospital an

additional payment under the terms of the governing agreements and erroneously awarded the hospital attorney's fees. In a sixth issue, the insurance company asserts that the trial court erroneously granted summary judgment to the preferred provider organization because there was a fact issue regarding whether the preferred provider organization negligently re-priced the hospital's bill, resulting in an increased payment amount due to the hospital. We affirm.

## BACKGROUND

This dispute involves three entities: (1) a hospital, Houston Northwest Partners, Ltd., d/b/a Houston Northwest Medical Center (the "Hospital"); (2) Concert Health Plan, Inc. a/k/a Concert Health Plan a/k/a Concert Health Plan Insurance Company ("Concert"), an insurance company providing insurance coverage to the patient who received medical services at the Hospital in this case; and (3) MultiPlan Corporation a/ka/ MultiPlan, Inc. and Private Healthcare Systems, Inc. a/k/a PHCS (collectively, "PHCS"), a preferred provider organization.[1] The Hospital entered into a participating provider agreement (the "Provider Agreement") with PHCS, making the Hospital a preferred provider in PHCS's network. Concert entered into a subscriber services agreement (the "Subscriber Agreement") with PHCS, pursuant to which Concert agreed to pay providers, such as the Hospital, in accordance with the applicable terms and conditions of the Provider Agreement between PHCS and the Hospital.

This dispute arose after a patient covered by Concert was treated at the Hospital from May 30, 2007 to June 12, 2007. The parties agree that the terms of "Exhibit C" to the Provider Agreement, effective January 1, 2007, control the

---

[1] MultiPlan, Inc. was in the process of acquiring Private Healthcare Systems, Inc. during the events that form the basis of this lawsuit. Private Healthcare Systems, Inc. is currently a wholly-owned subsidiary of MultiPlan, Inc.

2

pricing of the Hospital's claim in this case. This exhibit is entitled "Inpatient Services – Per Diem Reimbursement." It contains the following definitions, policies, and exclusions pertinent to resolution of this dispute:

> Billing. Facility [the Hospital] is required to submit a single, comprehensive bill using the industry standard Facility Claim form (UB-92 or successor form – not HCFA 1500). The standard facility claim form must include, at a minimum, the standard billing and patient information and the Facility's total billed charges for the services provided by Facility during the Covered Individual's Facility Stay.
>
> ***
>
> The following Revenue Code Exclusions are excluded from the Inpatient Category Preferred Payment Rates as defined in this Exhibit C and will be reimbursed pursuant to the Preferred Payment Rate Specified for each Revenue Code Exclusion.
>
> Revenue Code 0250: Pharmacy – General shall be reimbursed at a 50% discount when billed charges are $250 or more per item and then added back to the Preferred Payment Rate for the remainder of the claim. When billed charges are less than $250 per item, this exclusion does not apply and the charges will be included in the regular per diem/per case rate.
>
> ***
>
> Revenue Code 0636: Pharmacy – Extension of 025X shall be reimbursed at a 50% discount when billed charges are $250 or more per item and then added back to the Preferred Payment Rate for the remainder of the claim. When billed charges are less than $250 per item, this exclusion does not apply and the charges will be included in the regular per diem/per case rate.

The Hospital, pursuant to the Provider Agreement, submitted its bill to PHCS, using a UB-04 claim form, the successor form to the UB-92 described in Exhibit C. The Hospital's total bill was $96,175.17. As is relevant to this dispute, this bill contains several revenue codes possibly subject to the Revenue Code Exclusion described above. First, there is a single line identified by revenue code

3

"250" and described as "PHARMACY" for 261 "SERV. UNITS" with total charges of $13,525.80. The bill also contains several lines identified by revenue code "636." Only one of these "636" coded items is at issue here: it is described as "DAPTOMYCIN 1MG" for 3992 "SERV. UNITS" with total charges of $6,986.00.[2]

On June 27, 2007, PHCS "re-priced"—or adjusted the price of—the claim pursuant to the terms of the Provider Agreement. It provided a "PPO Claims Transmittal" form to Concert, indicating billed charges of $96,175.17, a "PPO Discount" of $68,771.17, and "Adjusted Charges" of $27,404.00. On August 20, 2007, the Hospital requested a "re-price review" of this claim, asserting that PHCS had failed to include reimbursement for the revenue code exclusions described above.[3] In this letter, the Hospital acknowledged that it had received $26,214.26 in payment on this claim, with a "member [patient] liability" still outstanding. The Hospital sought additional reimbursement of $10,864.03, which included payment for the Revenue Code Exclusions, for a total adjusted price of $37,831.53.[4]

PHCS re-priced the claim and submitted to Concert a "Hospital Claim Adjustment Notice," dated September 10, 2007, providing as follows:

> We have been requested by a participating provider to review the enclosed facility bill and determine if an adjustment should be made to the allowed amount. It is our determination that the adjustment is appropriate according to your contract with PHCS Network and should be made. *MultiPlan does not make determinations with respect to benefits or eligibility to pay claims.*

---

[2] Trial testimony established that "SERV. UNIT" is an abbreviation for "serving unit."

[3] For ease of reference, we will refer to the specific disputed revenue code exclusions on this claim as the "Revenue Code Exclusions" throughout the remainder of this opinion.

[4] At trial, the Hospital acknowledged that it had incorrectly calculated the amount due for revenue codes 250 and 636 and that the correct additional amount due for these codes was $10,255.90.

4

The correct allowable amount for the attached claim is $37658.90

*STDU 6 days @ 2080.00 per diem appl[ie]s + SURG 7 days @ 2132.00 per diem applies + Rev codes 250/636 @ 50% discount for each line item $250 or more*

*Rev code 250 @ 50% discount = $6792.90*

*Rev code 636(J0878) @ 50% discount = 3493.00*

Please adjust your claim accordingly. If you have any questions, need clarification or need a copy of the facility bill, feel free to call us . . . . You may also contact via email. . . .

(emphasis in original). PHCS also submitted a new PPO Claims Transmittal form to Concert. This new claim form indicated that the PPO discount was $58,515.27, and the adjusted charges were $37,659.90. The claim form contained the following message: "Re-Repriced Sheet. STDU 6 days @ 2080 per diem appl[ie]s + SURG 7 days @ 2132 per diem applies + Rev codes 250/636 @ 50% discount for each line item $250 or more[.]" The difference between the original re-priced claim and the adjusted re-priced claim was the addition of $10,255.90 for payment of the Revenue Code Exclusions.

Concert refused to pay the adjusted claim despite the Hospital's multiple collection efforts, both internally and through retained counsel. The Hospital's counsel notified PHCS in writing on February 10, 2009 that due to the protracted delay in Concert's payment of the adjusted claim, the Hospital could be entitled to payment of its full billed charges, less the payment that Concert had already made. On June 9, 2009, PHCS notified the Hospital that Concert's failure to honor the re-priced claim resulted in cancellation of Concert's discount under the Provider Agreement. PHCS stated that the unpaid claim had reverted to the Hospital's total billed charges and that it had notified Concert of this "loss of discount."

On October 9, 2009, the Hospital filed an arbitration petition against Concert with the American Health Lawyer's Association, seeking approximately $70,000

5

in economic damages under theories of breach of contract, promissory estoppel, and quantum meruit.[5]  Concert subsequently filed a lawsuit in federal district court in Illinois, attempting to enjoin the arbitration and seeking a declaratory judgment that it did not owe the Hospital any additional money and attorney's fees.  The Hospital filed a motion to dismiss Concert's lawsuit, which was granted by the federal district court in March 2010.

Before the dismissal of Concert's federal suit, the Hospital demanded indemnification from PHCS.[6]  PHCS rejected the Hospital's pre-litigation demand for indemnification.  After the federal suit in Illinois was dismissed, Concert refused to participate in the pending arbitration.  On April 6, 2010, the Hospital filed suit in district court in Harris County, seeking a declaratory judgment and an order compelling Concert to arbitration.  After the Hospital filed suit, Concert and the Hospital agreed to resolve their dispute in the Harris County district court.  The Hospital subsequently amended its petition, dropping its arbitration demand and declaratory judgment action, and asserting claims for breach of contract, promissory estoppel and quantum meruit against Concert.  In its live pleading, it alleged damages of at least $69,960.91, the difference between the amount it had

---

[5] The Provider Agreement provides for arbitration in this manner in the event of a dispute.

[6] The Provider Agreement contains the following indemnification clause:

> PHCS will indemnify and hold [the Hospital], and its respective directors, officers, agents, employees, and representatives, harmless from any and all liability, loss, damage, claim, or expense of any kind, including reasonable costs and attorneys' fees, which result from negligent or willful acts or omissions by PHCS and its directors, officers, agents, representatives, and employees regarding the duties and obligations of PHCS under this Agreement.

been paid for this claim—$26,214.26—and the amount of its original bill—$96,175.17.[7]

On July 13, 2010, Concert filed a third-party petition against PHCS. In its live pleading, it asserted claims for negligence and breach of fiduciary duty based on PHCS's handling of the re-pricing of this claim. PHCS sought summary judgment on Concert's claims in June 2011. In its summary-judgment motion, PHCS asserted that the only obligation or duty it owed to Concert relating to the payment of the claim at issue was to re-price the claim received from the Hospital and forward the re-priced claim to Concert for payment. PHCS admitted that it had made a calculation error in its original re-priced claim, but asserted that it promptly corrected the error and timely sent the corrected claim to Concert. According to PHCS, once it timely forwarded the corrected claim to Concert, it owed Concert no further obligation or duty relating to the claims process; thus, it asserted any damages sustained by Concert arose from Concert's decision to not pay the adjusted claim at issue rather than from any act or omission on PHCS's part.

Concert responded to PHCS's summary-judgment motion, claiming that there was a fact issue regarding whether PHCS's negligence caused it damages. Concert pointed to the following alleged fact issues in an effort to defeat summary judgment: the original mistake in re-pricing made by PHCS; the inconsistency between the amount sought by the Hospital in its request for a re-price review and the amount for which PHCS re-priced the claim, described *supra*; deposition testimony that there were ongoing discussions between Concert and PHCS

---

[7] Because PHCS continued to refuse to indemnify the Hospital, the Hospital amended its petition to add claims for breach of contract, negligence, and promissory estoppel against PHCS. The trial court entered a take nothing judgment in PHCS's favor, from which the Hospital has not appealed.

regarding re-pricing of claims; and deposition testimony that Concert had requested copies of the contracts governing the relationships between the parties from PHCS and had not been provided them. The trial court granted PHCS's summary-judgment motion on Concert's causes of actions against it on July 27, 2011.

A bench trial on the Hospital's claims against Concert and PHCS was held on October 24 and 25, 2011. Before the bench trial, the parties stipulated to numerous facts. Relevantly, the parties stipulated to the following:

- The discount rates at issue in the case are controlled by Exhibit C to the Provider Agreement between PHCS and the Hospital. This agreement is a legally valid and enforceable contract.

- Under the terms of the Subscriber Agreement, Concert is obligated to submit payments to the Hospital in accordance with the terms and conditions of the Provider Agreement.

- Pursuant to the Subscriber Agreement, PHCS is authorized to perform re-pricing services for Concert.

- The Hospital timely submitted a "clean claim" to PHCS in June of 2007, with total charges of $96,175.17 for medical services provided to Concert's insured to be paid by Concert pursuant to the Provider Agreement. On June 27, 2007, PHCS initially determined that $27,404.00 was the adjusted, or re-priced, amount under the Provider Agreement for which Concert was responsible.

- Around July 11, 2007, Concert processed the claim by paying $26,214.26 to the Hospital and identifying the patient as responsible for $1,189.74 under the terms of its policy with its insured.[8]

- On August 20, 2007 the Hospital formally and promptly appealed this claim by providing written notice of appeal to PHCS. In this notice, the

---

[8] Concert identified the patient as responsible for $753.24 in "co-insurance" and $436.50 as an "amount not covered" on the Explanation of Benefits ("EOB") it provided to the Hospital on July 11, 2007.

Hospital pointed out in detail that an additional $10,864.03[9] was owed by Concert on the Hospital's claim for treating Concert's insured because the amount Concert should have paid was $37,831.53.

- PHCS notified Concert in writing on September 10, 2007 that the correct allowable amount on this claim was $37,659.90. This notification was delivered by facsimile to Concert on September 11, 2007.

At the two-day bench trial, the Hospital presented the testimony of the only medical billing expert, Jaima Pravel. Pravel was the Hospital's Director of Revenue Analysis and had formerly been the manager of its disputed claims division. She testified that the average lay person would not be capable of calculating the proper amounts due under a patient's health insurance policy. According to Pravel, the Hospital submitted the appropriate "single comprehensive bill using the industry standard claim form," the UB-04 bill described above, as required by Exhibit C to the Provider Agreement. Pravel testified that on the UB-04, there were several line items containing revenue codes 250 and 636. She stated that for any of these line items in excess of $250, the Hospital should be reimbursed for fifty percent of the amount charged. She acknowledged that if the Revenue Code Exclusions were priced per "serving unit" on the UB-04 claim form or per item as reflected on the itemized statement rather than the UB-04, then the initial re-pricing provided by PHCS to Concert would have been correct.

Marcy Fuller, Executive Vice President and General Counsel for MultiPlan, Inc., also testified. She acknowledged that PHCS had made a mistake in the initial re-pricing of this claim. According to Fuller, PHCS expeditiously corrected the mistake and timely notified Concert of the adjusted re-pricing. She further testified that she reported to Concert, on behalf of the Hospital, that Concert's discount

_____

[9] As noted *supra*, at trial the Hospital acknowledged that it had miscalculated the amount due for the Revenue Code Exclusions and that the actual amount due for these codes was $10,255.90.

9

under the Provider Agreement had been cancelled because Concert had failed to pay in full the adjusted re-priced claim.

Johny Antony, Vice President of Operations and Underwriting for Concert, explained that Concert paid almost one hundred percent of claims initially re-priced by PHCS. He testified that, during the relevant time period of this litigation, Concert paid "very few claims on the second or third or fourth re[-]pricings." He stated that Concert paid the first re-priced claim with no knowledge of whether that re-priced claim was correct. According to Antony, if the first re-pricing had been $37,659—the amount of the adjusted re-priced claim—Concert would have paid that amount. He testified that, when Concert received the adjusted re-priced claim, it

> reviewed the contract and determined that the first repricing sheet was indeed the correct repricing sheet, the amount, based on the specific contract language in the contract and that intent, while good in nature or whatever, was not supported by the contract. The contract was very specific in how the repricing -- in what the repricing amount should have been and was calculated correctly the first time.

Finally, lead counsel for the Hospital, Randall Payne, testified regarding reasonable and necessary attorney's fees and expenses associated with this case, including the collection efforts his firm pursued on behalf of the Hospital, the attempted arbitration, defending the suit Concert filed in the Illinois federal district court, and potential appellate attorney's fees. He stated that, in his professional judgment, the total reasonable and necessary fees and costs attributable to this matter through the end of trial were $112,559.19. Payne further testified that he had handled many appeals in Texas state courts of appeal. He stated that it was his professional judgment that a reasonable and customary attorney's fee for appeal to a court of appeals would be an additional $30,000.00 to $40,000.00. He explained

10

that additional attorney's fees of $25,000.00 to $35,000.00 would be reasonable, customary, and usual for an appeal to the Supreme Court of Texas.

After the parties rested, the trial court requested that Concert file a post-trial brief on the cancellation-of-discount issue, which the Hospital had addressed in a trial brief. After considering the briefing filed by the Hospital and Concert, the trial court signed its final judgment on February 13, 2012. In its judgment, the trial court ordered that the Hospital recover $10,692.40 from Concert, which represented "actual economic damages, i.e. the amount Concert underpaid [the Hospital] on the claim at issue in this case," plus pre-judgment interest of $2,673.00 and costs of court. It further awarded the Hospital $80,000.00 in attorney's fees through trial, plus post-judgment interest on the total amount awarded to the Hospital. The trial court further ordered that the Hospital was entitled to recover $35,000.00 in appellate attorney's fees from Concert if the Hospital prevailed on an appeal filed by any party at the court of appeals. Finally, the court ordered that the Hospital was entitled to recover $30,000.00 in appellate attorney's fees from Concert if the Hospital prevailed on a petition for review filed by any party at the Supreme Court of Texas. After the trial court overruled Concert's motion to reconsider and for new trial, this appeal timely ensued.[10]

## ANALYSIS

### A.    The Judgment in Favor of the Hospital

In its first five issues, Concert challenges the trial court's judgment in favor of the Hospital. In its first issue, Concert asserts that, as a matter of law, it paid all that it owed to the Hospital under the terms of the Provider Agreement. Concert

---

[10] The trial court signed findings of fact and conclusions of law on July 12, 2012. Although filed after the expiry of the trial court's plenary power, we may consider these findings and conclusions because Concert properly requested them. *See Busch v. Hudson & Keyse, LLC*, 312 S.W.3d 294, 298 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

challenges the sufficiency of the evidence to support the trial court's finding that it owed an additional $10,692.40 to the Hospital in issue two. In its third issue, Concert argues that the Hospital was not entitled to attorney's fees because it cannot prevail on its breach of contract claim. Concert contends that the trial court abused its discretion in awarding the amount of attorney's fees it awarded to the Hospital in issue four. Finally, in its fifth issue, Concert challenges the sufficiency of the evidence to support the trial court's award of attorney's fees to the Hospital.

### 1. *The Award of $10,692.40 to the Hospital*

In its first two issues, Concert challenges the damages award to the hospital. Its first challenge is a legal challenge, in which it asserts that, under the terms of the contract, it paid all that it owed to the Hospital as a matter of law. To resolve this issue, we consider the law regarding contract interpretation.

### a. Contract Interpretation

In construing a contract, our primary concern is to ascertain the parties' intent as expressed in the writing. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and courts construe it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). An ambiguity does not arise merely because the parties' respective interpretations of it are conflicting. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). For an ambiguity to exist, both interpretations must be reasonable. *Id.* If the contract is not ambiguous, the court must enforce it as written. *Id.*

12

Here, as noted above, the dispute between the parties centers on the re-pricing of the Revenue Code Exclusions. These revenue codes are to be reimbursed "pursuant to the Preferred Payment Rate specified" for each exclusion. The Revenue Code Exclusions are defined similarly, providing that the Hospital "shall be reimbursed at a 50% discount when billed charges are $250 or more per item and then added back to the Preferred Payment Rate for the remainder of the claim." Concert equates the term "item" in these definitions with the "serving units" detailed on the UB-04 claim form.[11] It contends that, when the total charges for the Revenue Code Exclusions are divided by the serving units, none of the Revenue Code Exclusions exceeds $250 per serving unit or "item"; thus, it claims the Hospital is entitled to no reimbursement for any of these revenue codes.[12] The Hospital notes that revenue code 250 shows total charges of $13,525.80 and that one of several items coded as revenue code 636 shows total charges of $6,986.00. Accordingly, the Hospital contends that both of these charges should be reimbursed at the fifty percent discount for these revenue code exclusions because they are more than $250 "per item" as defined in the Provider Agreement.

---

[11] As noted above, there are several items of revenue code 636 on the bill at issue here; however, only the billing of one of these particular revenue codes, described *supra*, is disputed by the parties.

[12] Although Concert insists that the contract is not ambiguous, it appears to be asserting a latent ambiguity. A court may determine that a contract is ambiguous even if neither party makes the claim. *Reliance Ins. Co. v. Hibdon*, 333 S.W.3d 364, 369 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (op. on reh'g). An ambiguity in a contract may be either latent or patent. *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Inds., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam). A patent ambiguity is evident on the face of the contract; a latent ambiguity arises when a contract is unambiguous on its face, but in its application, an ambiguity appears by reason of some collateral matter. *See id.* If a latent ambiguity arises from the application of a contract to its subject matter, then evidence is admissible to determine the true intent of the parties as expressed in the agreement. *Id.* As discussed below, however, we conclude that the Provider Agreement is not ambiguous, either on its face or latently.

13

As detailed *supra*, under the terms of Exhibit C to this agreement, the Hospital is required to "submit a single comprehensive bill using the industry standard Facility Claim form." At the bench trial, the Hospital's expert, Jaima Pravel, testified that the claim form submitted to PHCS in this case, the UB-04 described above, is the successor form to the UB-92 identified in Exhibit C to the Provider Agreement. Concert does not dispute that the UB-04 is the successor form to the UB-92.

The UB-04 form submitted to PHCS contains a column labeled "serv. units" where the Hospital provided the number of these units for each described revenue code. Because the contractually-required facility claim form provides for documentation of the number of "serving units" for each revenue code, had the parties desired to base its revenue code reimbursement on these units, they could have done so.[13] By using the term "item," however, the plain language of the contract indicates that the parties did not intend to base reimbursement of these revenue codes on "serving units."

Accordingly, we conclude that the only reasonable interpretation of the Provider Agreement is that revenue codes 250 and 636 should be reimbursed at a fifty percent discount when billed charges on the UB-04 are $250 or more per item, not per serving unit. Disregarding the column labeled "serv. unit," the only revenue code items labeled 250 or 636 on the UB-04 bill at issue in excess of $250 per item are those described above. These two revenue code items were accounted

---

[13] We note that several of the descriptions for non-disputed revenue code 636 items include what appear to be dosage indicators. For instance, one item of revenue code 636 is described as "KETOROLAC 15MG"; another is described as "LORAZEPAM 2MG." If we begin dividing the billed charges for each revenue code by "serving units," which are not included in the definition for these revenue code exclusions, why would we not further factor these charges by the dosage information included in the descriptions of each item? If possible, when interpreting a contract, we should avoid a construction that is unreasonable, oppressive, inequitable, or absurd. *Hibdon*, 333 S.W.3d at 370.

for and included in PHCS's adjusted re-pricing of the Hospital's claim submitted to Concert, which Concert admittedly did not pay in full. Thus, the trial court did not err in concluding that Concert breached the Provider Agreement. The Hospital was therefore entitled to economic damages in the amount of $10,692.40—the difference between what Concert paid the Hospital and what it owed under the terms of the Provider Agreement. Accordingly, Concert did not establish that it paid all that it owed to the Hospital as a matter of law. We overrule its first issue.

### b. "Sufficiency" of the Evidence

In its second issue, Concert asserts that the evidence is legally and factually insufficient to support the trial court's award of $10,692.40 in damages to the Hospital. However, in its argument regarding this issue, it asserts as follows:

> The clear language of Exhibit C shows that no further amount is due as indicated by the first repricing from PHCS. In addition, there is testimony of Ms. Pravel that no more would be due under the terms of Exhibit C if the "per item" language was applied.
>
> In the original version of Exhibit C, a different provision was made for repricing of charges for Revenue Codes 250 and 636, aggregating those charges rather than addressing them per item. If the parties' intention was to have an aggregation of these charges, as is the position of [the Hospital] in this case, there would have been no need to change the language from the first Exhibit C with respect to those Revenue Codes. [The Hospital] is asking the Court to rewrite the Agreement, not interpret it. The first repricing statement from PHCS to Concert plainly follows the language of the Agreement as amended. The second can only survive by changing the language of the Agreement.
>
> However, Ms. Pravel further testified that there were no amendments of the Agreement from the time that it was placed into effect in January 2007 until two years after these charges were incurred so there was no modification of the contract from the language that is contained in the amended Exhibit C.

15

The evidence in this case is legally and factually insufficient to support the finding of the court that there was an additional $10,692.40 due and owing.

As is evidenced by reviewing the argument supporting its issue, Concert is not attacking the sufficiency of the evidence to support the trial court's finding. Rather, Concert attempts to support its proffered contract interpretation by introducing evidence and testimony. Only when a contract is *first* determined to be ambiguous may we consider the parties' interpretation and extraneous evidence to determine the true meaning of the agreement. *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Inds., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam). As discussed above, we have already determined that the Provider Agreement is not ambiguous. Thus, we do not consider evidence regarding interpretation of the Provider Agreement.[14] *See id.* For these reasons, we overrule Concert's second issue.

---

[14] If we were to consider evidence regarding interpretation of the Provider Agreement, we would review the trial court's findings of fact. A trial court's findings of fact are reviewed for sufficiency of the evidence under the same legal standards as apply to jury verdicts. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* Unchallenged factual findings are binding on a court of appeals unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court made the following unchallenged findings of fact, supported by the record, which also support its judgment.

19. On June 22, 2007 (i.e., ten days after the patient was discharged), Concert received the Hospital's clean claim for treating the patient from May 30th to June 12, 2007; and on or before June 27, 2007 Concert's claims processing/re-pricing agent (i.e., PHCS) received the Hospital's clean claim for treating the patient.

20. PHCS initially made an erroneous determination that only $27,404.00 was the allowed amount owed to the Plaintiff under the Participating Provider Agreement for which Concert was responsible to pay Plaintiff via its initial re-pricing of the claim on June 27, 2007.

21. On or about July 11, 2007, Concert processed the Plaintiff's claim and underpaid it when it [paid] only $26,214.26 and stating that the patient was

16

## 2. Attorney's Fees

In its third, fourth, and fifth issues, Concert challenges the trial court's award of attorney's fees to the Hospital. In its third issue, Concert complains that the

responsible for $1,189.74 (i.e. $753.24 as Co-Insurance and $436.50 as Amount Not Covered); and the Explanation of Benefits incorrectly stated that the total amount due to Plaintiff was only $27,404.00 - the original/initial re-priced amount provided by PHCS.

22. On August 20, 2007 the Plaintiff appealed Concert's decision to pay only $26,214.26 to the Plaintiff on the claim for treating the Patient, by giving written formal notice of appeal to PHCS, and which pointed out that an additional $10,864.03 was due and owing by Concert on the Plaintiffs claim for treating the Patient because the proper amount a/k/a the "Preferred Payment Rate" (i.e., the amount Concert should have paid), Concert should have paid was $37,831.53.

23. On September 10, 2007, PHCS notified Concert in writing, by "Hospital Claim Adjustment Notice" dated September 10, 2007, that PHCS had made an error on PHCS's original/initial re-pricing of the claim and that $37,659.90 was the correct amount Concert should have paid on the Plaintiff's claim.

24. On September 10, 2007 Concert received the "Hospital Claim Adjustment Notice" which gave notice that Plaintiff had requested an adjustment and an additional payment of $10,692.40 (i.e., the difference between the amount Concert originally paid - $26,214.26 - and the $37,659.90 adjusted/correct amount owed by Concert, according to PHCS/Multiplan's second/corrected re-pricing sheet dated September 10, 2007, less the patient's $743.24 co-insurance portion).

25. On September 10, 2007, simultaneously with the issuing of Multiplan/PHCS'[s] "Hospital Claim Adjustment Notice," PHCS issued its re-pricing sheet to Concert, wherein Concert was again advised that the adjusted amount allowed/Concert owed was $37,659.90.

26. On September 11, 2007 Concert received a faxed copy of PHCS/Multiplan's Hospital Claim Adjustment Notice dated September 10, 2007, wherein Plaintiff agreed with PHCS, to the effect that the true amount which Concert owed was$37,659.90.

27. Concert never made any additional payment on Plaintiffs claim for treating the patient, other than the initial payment of $26,214.26 which Concert paid on July 11, 2007.

28. After first crediting all payments, lawful offsets and credits, Concert still owes $10,692.40 to the Plaintiff for treating the Patient; and Concert has materially breached its contracts by its unjustified failure and refusal to pay the Plaintiff the additional $10,692.40 which Concert owes.

17

award of attorney's fees must be reversed because the Hospital cannot prevail on its breach of contract claims. We have already determined that the trial court properly found that Concert breached its contract with the Hospital by failing to pay the adjusted re-priced claim. Accordingly, we overrule Concert's third issue, and turn to its fourth and fifth issues.

### a. Standard of Review

Generally, we review a trial court's award of attorney's fees for an abuse of discretion. *Bocquet v. Herring,* 972 S.W.2d 19, 20–21 (Tex. 1998); *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990). Factors that a factfinder should consider when determining the reasonableness and necessity of a fee award include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

### b. No Abuse of Discretion in Making the Award

In its fourth issue, Concert asserts that the trial court abused its discretion in awarding $80,000 in attorney's fees for the trial of this case, as well as awarding appellate attorney's fees. A party may recover reasonable attorney's fees in a breach of contract case. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8). The

18

Hospital sued Concert for breach of contract and prevailed on its claim.[15] Concert has provided no relevant authority to support its argument that the Hospital was not entitled to recover *any* attorney's fees under this statutory authority.[16] In fact, an

---

[15] In its conclusions of law, the trial court stated:

- Concert materially breached its contracts and those breaches of contract proximately caused [the Hospital] actual economic damages in the amount of $10,692.40 (the amount Concert underpaid [the Hospital] on the claims at issue in this case), which [the Hospital] is entitled to recover from Concert.

- [The Hospital] is entitled to recover reasonable and necessary attorneys' fees from Concert, pursuant to Civ. Prac. & Rem. Code § 38.001. . . .

[16] Concert argues that when a creditor makes an excessive demand on a debtor, the creditor is not entitled to attorney's fees for subsequent litigation required to recover the debt. Concert asserts that the Hospital demanded almost $70,000 in damages—the amount due if Concert's discount under the Provider Agreement were cancelled—yet the trial court awarded it only $10,692.40. Concert contends the Hospital's demands were excessive when compared to the damages awarded, as opposed to the damages sought. Concert further claims that it has "indicated a willingness to pay an additional amount if the Agreement warranted it" since November 2009, shortly after the Hospital filed its petition in arbitration seeking this undiscounted amount in damages. It relies on *Collingsworth v. King*, 155 Tex. 93, 98–99, 283 S.W.2d 30, 33 (1955), and *Warrior Constructors, Inc. v. Small Business Investment Co. of Houston*, 536 S.W.2d 382, (Tex. App.—Houston [14th Dist.] 1976, no writ), to support this argument. We first note that both these cases involve simple suits to recover on notes, whereas this case involves a more complicated breach of contract claim. But even if these legal authorities are applicable to this case, they are readily distinguishable.

In *Collingsworth*, the plaintiff sued to recover principal, interest, and attorney's fees on vendor's lien notes. 283 S.W.2d at 30. In *Warrior Constructors*, a creditor brought suit against a partial guarantor to collect on a defaulted note. 536 S.W.2d at 383. In both of these cases, the creditor sought more than what was owed under the terms of the agreements at issue. *See Collingsworth*, 283 S.W.2d at 33 ("This record shows that the correct sum due, if calculated correctly, would have been paid but for the fact that . . . an officer of the Harlingen Bank . . . had been directed to collect 10% additional as collection costs. . . . [This] demand was excessive and . . . petitioners were not chargeable with attorney's fees."); *Warrior Constructors*, 536 S.W.2d at 387 (explaining that demand was made on Warrior Constructors for "no less than complete payment of the total unpaid balance of principal, interest, and attorney's fees," but that Warrior Constructors was liable for $10,000 less in principal than the demanded amount and thus, Warrior Constructors was not liable for attorney's fees for creditor's subsequent litigation to recover debt because creditor's demand was excessive).

Here, the record establishes that the Hospital notified PHCS, Concert's admitted agent for re-pricing, on August 20, 2007, that it believed an error had been made in PHCS's re-pricing of this claim. The parties stipulated that this notification was promptly provided. PHCS in turn

19

award of attorney's fees is mandatory under section 38.001 if there is proof of the reasonableness of the fees. *Hassell Constr. Co. v. Stature Commercial Co.*, 162 S.W.3d 664, 668 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Absent any relevant legal authority to the contrary, we cannot say the trial court abused its discretion in awarding attorney's fees to the Hospital. We overrule Concert's fourth issue.

---

provided Concert with the claim adjustment notice on September 10, 2007, notifying Concert that PHCS had adjusted the claim and that Concert owed an additional $10,692.40 on this claim. The Hospital first made numerous in-house attempts to collect only the additional amount due under the adjusted claim from Concert. The Hospital initially engaged counsel to attempt to recover the additional amount due on this claim in April 2008; counsel made several attempts to recover the additional amount due under the adjusted claim, although counsel mentioned that the amount due "exclud[ed] any applicable prompt payment penalties, interest and attorney's fees."

Concert responded on January 5, 2009, stating that no further amounts were due on this claim and that the Hospital's request for additional benefit coverage for the claim was denied. On January 29, 2009, counsel for the Hospital notified PHCS's claims department that Concert had rejected the Hospital's request to reprocess the claim. On February 10, 2009, counsel for the Hospital corresponded with PHCS and requested that PHCS notify it when Concert "remits the balance due and owing on this account." In this letter, counsel for the Hospital detailed both the Hospital's and counsel's numerous efforts to collect the amount that Concert had underpaid on this claim. In this letter to PHCS, counsel for the Hospital indicated that it believed that Concert could be liable for the entire amount due under the original bill, less the amount that Concert had already paid, plus attorney's fees because of Concert's failure to promptly pay the adjusted claim. On September 9, 2009, PHCS notified counsel for the Hospital that it had "exhausted all efforts in assisting [the] firm in collecting the underpayment due" the Hospital and stated, "After careful consideration, we determined it necessary to cancel the discount applied to the claim. Additionally, Concert Health Plan has been notified of the loss of discount."

As is clear from the above, the Hospital did not make an "excessive" demand on Concert such that Concert should not be liable for any attorney's fees. The Hospital repeatedly attempted to collect only the additional amount due under the adjusted re-priced claim from September 2007 until it filed its petition in arbitration in October of 2009. At that point, both the Hospital and PHCS agreed that Concert was no longer entitled to the benefit of the discount pursuant to the Provider Agreement, and the Hospital sought the full amount of the original bill, less the amount that Concert had paid. The issue of whether Concert was entitled to the discount under the Provider Agreement was contested all the way through trial and post-trial briefing. Accordingly, the cases cited by Concert regarding a creditor's "excessive" demand are readily distinguishable from the facts of this case and do not support Concert's position that the Hospital is not entitled to attorney's fees.

### c. "Sufficiency" of the Evidence

In its fifth issue, Concert asserts that the evidence is legally and factually insufficient to support the trial court's award of attorney's fees.[17] In support of this issue, Concert argues as follows:

> [T]he evidence in this case is legally and factually insufficient to support a finding of $80,000 in attorney's fees since it fails to break down the fees based on time periods and tasks on which the time was spent. Thus it is not possible from this record to determine how much of Plaintiff[']s fees were expended to further a theory of recovery that was denied by the trial court.
>
> Here [Concert] submits that the lack of evidence showing how much of the efforts of [the Hospital's] attorneys were directed to a claim that was rejected by the trial court means that there is no evidence to support the trial court's finding of $80,000 in attorney's fees since most of [the Hospital]'s attorney's fees may have been directed to an attempt to recover a claim which was ultimately rejected.

Similarly, it its motion to reconsider and for new trial, Concert argued:

> The evidence in this case is legally and factually insufficient to support a finding of $80,000 in attorneys fees since it fails to break down the fees based on time periods and tasks on which the time was spent. Thus it is not possible from this record to determine how much of Plaintiff[']s fees were expended on a theory of recovery and for damages denied by this Court.

Although the word "segregation" is not used, Concert is actually making a segregation argument regarding the attorney's fees rather than a sufficiency challenge to the reasonableness of the fees.

---

[17] Concert relies on *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012), as legal authority, although it notes that the "legal and factual situation is different" in *El Apple I*. *El Apple I* is an employment discrimination and retaliation case pursuant to the Texas Commission on Human Rights Act in which the Supreme Court of Texas utilized the lodestar method for calculating the appropriate attorney's fees. *Id.* at 758. Because the lodestar method is *not* the method used for calculating the appropriate attorney's fees in a breach-of-contract case, this case is not instructive to our analysis.

Attorney's fees that relate solely to a claim for which fees are *unrecoverable* must be segregated. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). All the claims advanced by the Hospital against Concert involve breach of the Provider Agreement. As such, reasonable attorney's fees are recoverable for all of the Hospital's claims. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8). Additionally, counsel for the Hospital testified regarding each of the *Arthur Andersen* factors identified *supra*, and Concert has not challenged the fees on any of these bases.[18] Accordingly, we overrule Concert's fifth issue.

---

[18] Randall Payne, lead counsel for the Hospital, testified that he had nearly thirty years' experience in civil cases and was board certified in civil trial law. He stated that, in considering whether the fees charged in this case were reasonable, he considered the time and labor required to handle the work, the novelty and difficulty of the questions involved, the skill and requisite experience to perform the legal services properly, the likelihood that the acceptance of this matter would preclude the attorneys involved from other employment, the fees customarily charged in Harris County for the type of legal services performed, the likelihood of recovery, and the length of representation of the Hospital by his firm. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). According to Payne, the Hospital had to engage Illinois counsel to assist in defending against the federal lawsuit filed by Concert; the firm the Hospital engaged spent 55.25 hours for total attorney's fees of $16,621.25, which Payne testified was a reasonable and necessary fee. Payne stated that the amount of reasonable and necessary attorney's fees charged by his firm to the Hospital prior to trial was $79,903.75.

Payne explained that representing the Hospital at trial would cost the Hospital approximately $10,000.00 more in attorney's fees, which he stated he believed was a reasonable and necessary amount. He testified that the arbitration fee paid by the Hospital was $2,550.00 and that, when he added in deposition costs, the total costs incurred by the Hospital were $5,960.89. As noted above, Payne testified that the Hospital's total reasonable and necessary attorney's fees for trial would be $112,559.19. He further testified that reasonable and necessary attorney's fees for an appeal to the court of appeals would be $30,000.00 to $40,000.00 and for an appeal to the Supreme Court of Texas, $25,000.00 to $35,000.00 would be a reasonable and necessary fee.

The trial court found that the reasonable and necessary legal fees for services performed on behalf of the Hospital through the trial of this case were $80,000; that if any party files an appeal to the court of appeals, the reasonable and necessary attorney's fees which would be performed on the Hospital's behalf would be an additional $35,000; and that if any party files a petition for review with the Supreme Court of Texas, the reasonable and necessary attorney's fees performed on behalf of the Hospital would be an additional $30,000. None of these findings are challenged on appeal, and they are all supported by Payne's testimony. *See McGalliard*, 722

## B.    The Summary Judgment in Favor of PHCS

In Concert's sixth and final issue, it claims that a fact issue regarding whether PHCS was negligent in re-pricing the claim from which this lawsuit arises prevents summary judgment in favor of PHCS.  Concert asserts that the only basis for summary judgment in favor of PHCS was PHCS's claim that its negligence did not harm Concert because Concert caused its own damages by failing to pay the adjusted re-priced claim.[19]  Concert contends that PHCS erred in providing the adjusted re-priced claim and that this error led to the Hospital's lawsuit and to damages to Concert.  Concert has rested its success on this issue on overturning the breach-of-contract finding in favor of the Hospital:  "However, as seen from the issues presented above [the issues related to the Hospital], the error was in the second repricing and that error clearly led to this lawsuit and to damages to Concert."

We have determined that there was no error in the second re-pricing provided by PHCS and have overruled each of Concert's issues related to the Hospital.  The trial court properly concluded that Concert breached the Provider Agreement by failing to pay the Hospital the additional amount it owed pursuant to

---

S.W.2d at 696 (providing that unchallenged fact findings are binding on courts of appeal unless, as is applicable here, no evidence supports them).

[19] The trial court granted summary judgment without specifying the grounds upon which it relied.  On appeal, Concert must establish that each independent summary-judgment ground asserted against its claims does not provide a basis for affirming the trial court's summary judgment.  *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 611 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  In a negligence action, a plaintiff must show that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's injuries.  *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).  PHCS asserted in its summary-judgment motion that it was not negligent because it did not breach any duty it owed to Concert.  On appeal, Concert has not attacked this independent ground for summary judgment.  Because Concert has not challenged this independent basis for the trial court's summary judgment, its issue lacks merit.  *See Parkway Dental Assocs., P.A.*, 391 S.W.3d at 611.

the adjusted claim. Because Concert asserts no other basis for reversing the summary judgment in favor of PHCS, we overrule its sixth and final issue.

## CONCLUSION

We have overruled Concert's five issues relating to the judgment in favor of the Hospital. We have also overruled Concert's final issue regarding the summary judgment in favor of PHCS. Having overruled each of Concert's issues, we affirm the trial court's judgment.


/s/    Adele Hedges
Chief Justice

Panel consists of Chief Justice Hedges and Justices Boyce and Donovan.